**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


ROBERT JAMES PETRICK,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Petitioner,⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀1:09CV551
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
CYNTHIA O. THORNTON,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Respondent.[1]⠀⠀)


## MEMORANDUM OPINION AND ORDER

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket Entry 1.) A jury in the Superior Court of Durham County found Petitioner guilty of first degree murder in case number 03CRS49331, whereupon the trial court entered judgment sentencing Petitioner to life imprisonment. (Id., ¶¶ 1-6.) He pursued but failed to secure relief on direct appeal. State v. Petrick, 186 N.C. App. 597, 652 S.E.2d 688 (2007), appeal dismissed and review denied, 362 N.C. 242, 660 S.E.2d 540 (2008).

The Superior Court thereafter denied Petitioner's Motion for Appropriate Relief ("MAR") and the North Carolina Court of Appeals declined review. (Docket Entry 1, ¶¶ 10, 11; see also Docket Entry 12-10 (MAR); Docket Entry 12-11 (order denying MAR); Docket Entry 12-12 (certiorari petition); Docket Entry 12-14 (order denying certiorari).) He then instituted this action (Docket Entry 1) and

---

[1] Consistent with Rule 2(a) of the Rules Governing Section 2254 Cases, the Petition in this case originally named Sandra Thomas, then-warden of the prison at which Petitioner then resided, as Respondent. (Docket Entry 1 at 1.) Petitioner now resides at a different prison and has moved to substitute his current warden as Respondent. (Docket Entry 37.) The Court grants that request.

sought leave to conduct discovery (Docket Entry 5). Respondent answered (Docket Entry 10) and moved for summary judgment (Docket Entry 11). After Petitioner filed his opposition to summary judgment (Docket Entry 22), the Court granted in part Petitioner's request for discovery (Docket Entry 27). Respondent made a supplemental filing consistent with the Court's discovery order (Docket Entry 31) and Petitioner replied (Docket Entry 32). For the reasons that follow, the Court denies any habeas relief.[2]

## I.  FACTUAL BACKGROUND

The North Carolina Court of Appeals summarized some of the basic facts underlying Petitioner's conviction as follows:

> [Petitioner] reported his wife . . . missing after she failed to return home from a practice with the North Carolina Symphony. Officers found [her] car parked in a parking deck located across the street from where the North Carolina Symphony had practiced. No signs of a struggle were apparent inside or around [her] car.
>
> Four months later, . . . [her] body floated to the surface of [a lake near Durham, North Carolina] wrapped in a sleeping bag and a tarp and sealed with duct tape. Chains were wrapped around [her] legs and her body was identified from dental records.
>
> [Petitioner] was arrested . . . [and an attorney] was appointed to represent [him]. . . . [Before trial, Petitioner] moved to dismiss [his appointed attorney] and for the appointment of new counsel. The trial court allowed [Petitioner] to proceed pro se and ordered [his original appointed counsel] to remain available as standby counsel.
>
> [Petitioner subsequently] waived his right to all assistance of counsel and stated he desired to represent himself and appear on his own behalf for trial. . . .

[2] The parties have consented to disposition of this case by a United States Magistrate Judge. (Docket Entry 26.)

[At trial] a cadaver dog handler [] testif[ied] concerning the significance of various behaviors displayed by the dog [during a search of Petitioner's residence and vehicle] . . . [and] witnesses testif[ied] to the victim's statements concerning her and [Petitioner's] financial situation and [his] alleged acts of domestic violence against [her]. . . .

[In addition], the State introduced evidence of [Petitioner's] financial dealings with other people, depletion of the victim's bank accounts, violent acts toward the victim, and his adulterous relationships.

Petrick, 186 N.C. App. at 598-605, 652 S.E.2d at 690-93.

## II.  PETITIONER'S CLAIMS

The Petition identifies eight grounds for relief:

1) "[t]he trial court erred in not informing [Petitioner] that, if counsel and [Petitioner] were at an absolute impasse, it would be [Petitioner's] wishes that controlled" (Docket Entry 1, ¶ 12 (Ground One));[3]

2) "[t]he trial court committed plain error by admitting opinion testimony from a cadaver dog handler" (id. (Ground Two));

3) "[t]he trial court committed plain error in allowing heresay [sic] testimony from witnesses" (id. (Ground Three));

4) "[t]he trial court committed plain error in admitting evidence of alleged prior bad acts and character opinion testimony" (id. (Ground Four));

5) "[t]he trial court committed plain error by allowing a complete breakdown of the adversarial process" (id. (Ground Five));

_____

[3] Petitioner generally has used only capital letters in his written filings. (See, e.g., Docket Entry 1.)  For ease of reading, this Memorandum Opinion employs standard capitalization conventions when quoting such filings.

-3-

6) "[Petitioner's] constitutional rights were violated when perjured testimony was knowingly presented to the jury" (id. (Ground Six));

7) "[Petitioner's] constitutional rights were violated when evidence was witheld [sic] by the prosecution" (id. (Ground Seven)); and

8) "[Petitioner's] constitutional rights under the Sixth Amendment were violated by the ineffective assistance of appellate counsel" (id. at 28).[4]

## III.  HABEAS STANDARDS

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Further, "[b]efore [the] [C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court.  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to [this] [C]ourt in a habeas petition.  The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).

When a petitioner has exhausted state remedies, this Court must apply a highly deferential standard of review in connection

---

[4] Unlike with Grounds One through Seven, which the Petition identifies on pages of the standard Section 2254 form before elaborating on "continuation pages" (cited herein by reference to the page number(s) appended by the CM/ECF system upon filing), the Petition's description of Ground Eight appears only on a continuation page.  (Compare Docket Entry 1, ¶ 12, with id. at 21-28.)

with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d).  More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id.  To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court [or] . . . confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite to that reached by [the United States Supreme Court]."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision "involves an unreasonable application" of United States Supreme Court case law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407; see also id. at 409-11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous").

## IV.  DISCUSSION

### A.  Ground One – Inadequate Colloquy regarding Petitioner's Decision to Proceed without Counsel

According to Ground One of the Petition, when Petitioner moved to have his appointed attorney relieved, the trial court violated

Petitioner's Sixth Amendment right to counsel by "not informing [Petitioner] that, if counsel and [Petitioner] were at an absolute impasse as to trial decisions, it would be [Petitioner's] decisions that controlled." (Docket Entry 1 at 21.) Petitioner raised this same basic contention at both steps of his direct appeal (see Docket Entry 12-4 at 19-27; Docket Entry 12-7 at 8-10), with the North Carolina Court of Appeals rejecting it on the merits, see Petrick, 186 N.C. App. at 599-601, 652 S.E.2d at 690-91,[5] and the North Carolina Supreme Court declining to hear the matter, Petrick, 362 N.C. at 242, 660 S.E.2d at 540. As a result, Section 2254(d)(1)'s deferential review standard applies to Ground One. To secure relief under that standard, Petitioner must show that, in denying this claim, the North Carolina Court of Appeals reached "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law," Williams, 529 U.S. at 405, "confront[ed] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[d] at a result opposite to that reached by [the United States Supreme Court]," id., or "identifie[d] the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applie[d] it to the facts of [his] case," id. at 407.

---

[5] "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, __, 131 S. Ct. 770, 784-85 (2011); see also Hill v. Ozmint, 339 F.3d 187, 196 (4th Cir. 2003) (rejecting "conten[tion] that, because the state court referenced only state law in resolving [a federal] claim, it failed to 'adjudicate' it 'on the merits'").

-6-

Petitioner, however, has not identified a United States Supreme Court decision on point that the North Carolina Court of Appeals either contradicted or unreasonably applied. (See Docket Entry 1 at 21; Docket Entry 22 at 2-5.) Instead, Petitioner asserts that certain North Carolina state-court rulings gave him the right to direct "'tactical decisions'" and that the trial court should have advised him consistently with those state-court rulings. (Docket Entry 22 at 3 (quoting State v. Ali, 329 N.C. 394, 403, 407 S.E.2d 183, 189 (1991), and citing other North Carolina cases).) To the extent Petitioner contends the trial court acted contrary to state law, any such contention provides no basis for relief here, because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Nor has the Court independently located any United States Supreme Court decision that would have required the North Carolina Court of Appeals to hold that the trial court should have advised Petitioner that he had the right to proceed with appointed counsel while still maintaining the authority to make all decisions about the conduct of the trial. To the contrary, the United States Supreme Court's well-known description of an attorney's responsibilities does not endorse the view that an attorney must capitulate to a client's preferences about the handling of a defense, but rather references only an attorney's "duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the

-7-

prosecution." Strickland v. Washington, 466 U.S. 668, 688 (1984).
Under these circumstances, Petitioner cannot satisfy Section
2254(d)(1) as to Ground One.  Put another way, "[t]he lack of a
controlling [United States] Supreme Court precedent is fatal to
[Petitioner's instant] habeas claim . . . ." Stroud v. Polk, 466
F.3d 291, 297 (4th Cir. 2006).[6]

### B.  Ground Two – Erroneous Admission of Opinion Testimony by Cadaver Dog Handler

The Petition next contends that "[t]he trial court violated
[Petitioner's] constitutional rights under the Sixth Amendment and
committed plain error by admitting into evidence opinion testimony
from a cadaver dog handler concerning the significance of various
behaviors displayed by the dog."  (Docket Entry 1 at 22.)  On
direct appeal to the North Carolina Court of Appeals, Petitioner
also attempted to challenge the trial court's admission of the

---

[6] Petitioner's brief opposing Respondent's summary judgment motion baldly
asserts that "the state appellate court adjudication [of this issue] was in fact
based on an unreasonable determination of facts in light of the evidence
presented in the state court proceedings, thus meeting the standards of
§ 2254(d)(2)."  (Docket Entry 22 at 3.)  However, said brief does not identify
any specific factual finding(s) the state court unreasonably made.  (See id. at
3-5.)  As a result, Petitioner cannot secure relief under Section 2254(d)(2).
See Oliver v. Wengler, No. 1:12CV96EJL, 2013 WL 5707342, at *3 (D. Idaho Oct. 21,
2013) (unpublished) ("Although [the] [p]etitioner states . . . that 'a segment
of the state courts [sic] decisions are predicated upon an unreasonable
determination of the facts,' he does not identify any specific factual finding
that he contends is unreasonable.  This is insufficient to show that the
decisions of the [state court] were based on an unreasonable determination of the
facts." (internal citation omitted)); Marcus v. Conway, No. 04CIV64JSR, 2007 WL
1974305, at *6 (S.D.N.Y. July 5, 2007) (unpublished) ("[T]he petitioner's
conclusory statement, that the state court's decision is based on an unreasonable
determination of the facts in light of the evidence presented at the state court
proceedings, does nothing more than quote the applicable statutory language.
Without more, that is not sufficient to satisfy the burden placed on [him] by 28
U.S.C. § 2254(d)."); see also Davis v. Jones, 506 F.3d 1325, 1330 n.8 (11th Cir.
2007) (declining to consider "argument that the state court made an unreasonable
determination of the facts under 28 U.S.C. § 2254(d)(2)," where the petitioner
did "not challeng[e] any specific factual finding").

-8-

cadaver dog handler's testimony (see Docket Entry 12-4 at 27-31); however, that court declined to consider the matter as follows:

> [Petitioner] objected to the introduction of evidence from the cadaver dog [handler] by pretrial motion, but failed to preserve the issue by renewing his objection when the evidence was presented at trial. [Petitioner], in his brief and at oral argument, failed to "specifically and distinctly contend" the admission of this evidence "amounted to plain error." N.C. R. App. P. 10(c)(4). This assignment of error is dismissed due to [Petitioner's] failure to properly preserve and present it or to request and argue for plain error review. State v. Washington, 134 N.C. App. 479, 485, 518 S.E.2d 14, 17 (1999).

Petrick, 186 N.C. App. at 601-02, 652 S.E.2d at 691 (internal brackets omitted) (emphasis added). Petitioner then sought further review of the issue (see Docket Entry 12-7 at 10-19), but the North Carolina Supreme Court refused to take up his case, Petrick, 362 N.C. at 242, 660 S.E.2d at 540.

Where a state-court criminal defendant (like Petitioner) fails to make a proper, contemporaneous objection at trial and thus can secure at most plain error review on direct appeal, this Court is "procedurally barred from considering th[at] claim, unless [that defendant] can show cause and prejudice for his failure to preserve the issue by a timely objection." Daniels v. Lee, 316 F.3d 477, 487 (4th Cir. 2003). Respondent specifically invoked that procedural bar in connection with its summary judgment motion. (Docket Entry 12 at 11.)[7] "In asking this Court to review this

---

[7] Because the procedural bar in question arises from Petitioner's failure to make a contemporaneous objection at trial, any alleged, subsequent ineffective assistance by his appellate counsel in neglecting to request plain error review in the manner required by North Carolina law cannot serve as cause sufficient to overcome the relevant procedural bar.

ground and override [Respondent's] claim of procedural default, [Petitioner] rel[ies] upon this Court's interpretation of the cause and prejudice standard outlined in <u>Coleman v. Thompson</u>, 501 U.S. [722,] 750 (1991)."  (Docket Entry 22 at 7.)

Specifically, Petitioner asserts that "cause has already been outlined in the record and argument; [the trial court's] actions, outlined in Ground 1 [of the Petition], which caused [Petitioner] to unwillingly, and against [his] best interest, represent [him]self pro se, which led in turn to [his] inadvertent failure to object before the jury . . . ."  (<u>Id.</u>)  As discussed in Subsection IV.A., however, Petitioner has not shown that the North Carolina Court of Appeals unreasonably concluded that the trial court properly handled its colloquy with Petitioner about his decision to proceed pro se.  Accordingly, Petitioner's proffered "cause" does not excuse his failure to contemporaneously object to the admission of the cadaver dog handler's testimony and thus a procedural bar prohibits this Court's consideration of Ground Two.  <u>See, e.g.,</u> <u>Siluk v. Beard</u>, 395 F. App'x 817, 820 (3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law.  We must therefore conclude that [the petitioner's] pro se status, without more, cannot constitute cause sufficient to excuse the procedural default of his federal claims in state court." (internal citations omitted)); <u>Jones v. Armstrong</u>, 367 F. App'x 256, 258 (2d Cir. 2010) ("[The petitioner's] own ineffectiveness while proceeding pro se does not constitute cause for his procedural default because it is not

'something external to the petitioner, something that cannot be fairly attributed to him.' It is, in fact, precisely the opposite, a conclusion that many courts have reached. Moreover, . . . [t]he Supreme Court has held that 'a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to denial of effective assistance of counsel.'" (internal citations and emphasis omitted) (quoting Coleman, 501 U.S. at 753, and Faretta v. California, 422 U.S. 806, 834 n.46 (1975), respectively)); Holloway v. Smith, No. 95-7737, 81 F.3d 149 (table), 1996 WL 160777, at *1 (4th Cir. Apr. 8, 1996) (unpublished) ("[The petitioner] does not meet the cause and prejudice standard because unfamiliarity with the law and his pro se status do not constitute adequate justification to excuse his failure to present the claim earlier . . . .").[8]

---

[8] As noted above, Petitioner invoked the "cause and prejudice" exception to procedural default (recognized in Coleman). That decision also permits review of a procedurally defaulted claim where "the failure to consider the claim will result in a fundamental miscarriage of justice." Fowler v. Joyner, 753 F.3d 446, 460 (4th Cir. 2014) (citing Coleman, 501 U.S. at 750). In opposing Respondent's summary judgment motion, Petitioner did not rely on that alternative exception. (See Docket Entry 22 at 6-28.) The Court thus need go no further. See Coleman, 501 U.S. at 757 ("As [the petitioner] does not argue in this Court that federal review of his claims is necessary to prevent a fundamental miscarriage of justice, he is barred from bringing these claims in federal habeas."); Thompkins v. Pfister, 698 F.3d 976, 987 n.5 (7th Cir. 2012) ("[The petitioner] does not argue that without federal habeas review, he will suffer a fundamental miscarriage of justice, so we do not address this ground for relief from the procedural default."). Nor would the evident circumstances have allowed Petitioner to secure review under the "fundamental miscarriage of justice" exception, "a severely confined category," McQuiggin v. Perkins, ___ U.S. ___, ___, 133 S.Ct. 1924, 1933 (2013), which "requires the habeas petitioner to show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent,'" Schlup v. Delo, 513 U.S. 298, 327 (1995) (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)). "[E]xperience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness
(continued...)

## C.  Ground Three – Erroneous Admission of Hearsay Testimony

As its Ground Three, the Petition asserts that "[t]he trial court violated [Petitioner's] constitutional rights under the Sixth Amendment and committed plain error in allowing witnesses to testify to statements allegedly made to them by the decedent." (Docket Entry 1 at 23; see also id. ("The trial court did not find any statutory exception to the rule against heresay [sic], making the unsupported pronouncement that statements by victims are per se admissible.").)  The only even general example of such testimony identified in the Petition concerns statements attributed by a witness (or witnesses) to Petitioner's wife "that [he] supposedly attacked [her] . . . ." (Id.)  The Petition neither references the name of any witness who allegedly gave purportedly improper

---

[8](...continued)
accounts, or critical physical evidence — that was not presented at trial." Id. at 324. Moreover, "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.  The petitioner thus is required to make a stronger showing than that needed to establish prejudice." Id. at 327. Petitioner neither has attempted to make nor has made anything approaching that level of showing.  (See Docket Entry 1 at 22-28; Docket Entry 22 at 6-28; Docket Entry 32 at 1-4.)  At various points (for the apparent purpose of refuting a lack of prejudice argument), Petitioner has asserted (in largely conclusory fashion) that, apart from the cadaver dog handler's testimony, Respondent presented only circumstantial evidence to establish Petitioner's guilt.  (See Docket Entry 1 at 22; Docket Entry 22 at 6, 8-9; Docket Entry 32 at 3.)  Even if true, that assertion would not suggest any weakness in the case against Petitioner (much less his actual innocence).  To the contrary, "[i]t is, of course, fundamental that a criminal offense may be proven beyond a reasonable doubt by circumstantial evidence and that direct evidence of the essential elements of a crime is not necessary." United States v. Gober, 331 F. Supp. 252, 253 (W.D. Okla. 1971); see also Gulf, Colo. & Santa Fe R.R. Co. v. Washington, 49 F. 347, 350 (8th Cir. 1892) ("One who kills another in secret, when no eye sees the deadly potion administered or the fatal blow struck, may be convicted of murder, and hanged on circumstantial evidence[.]").  Moreover, no less an authority than the United States Supreme Court has recognized that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330 (1960).

testimony on this vague subject nor points to anything that would identify any such witness(es) or testimony. (See id.)

A petition under Section 2254 "must: (1) specify all the grounds for relief available to the petitioner; [and] (2) state the facts supporting each ground[.]" Rule 2(c), Rules Governing Section 2254 Cases (emphasis added). "'[I]n order to substantially comply with the Section 2254 Rule 2(c), a petitioner must state specific, particularized facts which entitle him or her to habeas corpus relief for each ground specified. These facts must consist of sufficient detail to enable the court to determine, from the face of the petition alone, whether the petition merits further habeas corpus review.'" Bullard v. Chavis, No. 96-7614, 153 F.3d 719 (table), 1998 WL 480727, at *2 (4th Cir. Aug. 6, 1998) (unpublished) (quoting with approval Adams v. Armontrout, 897 F.2d 332, 334 (8th Cir. 1990)) (emphasis added); see also Mayle v. Felix, 545 U.S. 644, 655 (2005) (explaining that, compared to Federal Rule of Civil Procedure 8(a), "Habeas Corpus Rule 2(c) is more demanding"); McFarland v. Scott, 512 U.S. 849, 856 (1994) ("Habeas corpus petitions must meet heightened pleading requirements . . . ."); Aubut v. Maine, 431 F.2d 688, 689 (1st Cir. 1970) ("We do not accept 'notice' pleading in habeas corpus proceedings."); Henderson v. Cate, No. 06CV1545JAH(WMc), 2009 WL 3126295, at *7 (S.D. Cal. Sept. 24, 2009) (unpublished) ("In order to validly state a claim for habeas relief, [a] [p]etitioner must set forth sufficient facts to support each and every claim. . . . Such a requirement reflects a concern for the respect of state

trial court adjudication by imposing on the habeas petitioner the burden of alleging and proving primary facts which justify federal intervention in a state-resolved case.").

Ground Three falls short under the foregoing standard in light of the conclusory nature of its allegations, which, inter alia, fail to identify the specific witness testimony allegedly erroneously admitted. See <u>Martin v. Warden, Forcht Wade Corr. Ctr.</u>, 289 F. App'x 682, 683 (5th Cir. 2008) ("Although [the petitioner] argues that the testimony of 'various officers' violated his right to confrontation, [he mentions] only [two] specific officers . . . and he fails to identify any specific trial testimony. Conclusional allegations on a critical issue do not raise a constitutional issue and are not sufficient to warrant habeas relief."); <u>Black v. Miller</u>, No. CV12-10875PSG(E), 2013 WL 6002896, at *19 (C.D. Cal. Nov. 6, 2013) (unpublished) ("[The] [p]etitioner's claim that the court erred in admitting the unidentified hearsay testimony of [a witness] does not merit habeas relief."); <u>Tebelman v. Brunsman</u>, No. 3:10CV2271, 2012 WL 1004759, at *10 n.145 (N.D. Ohio Jan. 30, 2012) (unpublished) (observing that the petitioner did not comply with Section 2254 Rule 2(c) where he "never articulated with specificity in his habeas petition the particular statements he contends were improperly admitted as hearsay"), <u>recommendation adopted</u>, 2012 WL 1004758 (N.D. Ohio Mar. 23, 2012) (unpublished); <u>Arredondo v. Sandor</u>, No. CV10-1115CAS(MRW), 2011 WL 5357683, at *9 (C.D. Cal. Oct. 11, 2011) (unpublished) ("As to [the] [p]etitioner's contention regarding

the admission of hearsay testimony about his wife's statements, the conclusory argument is insufficient on habeas review."), recommendation adopted, 2011 WL 5294861 (C.D. Cal. Nov. 3, 2011) (unpublished), aff'd, ___ F. App'x ___, 2014 WL 4290810 (9th Cir. 2014); Lavoll v. Neven, No. 2:08CV11PMP(GWF), 2010 WL 4974541, at *9 (D. Nev. Nov. 30, 2010) (unpublished) ("Ground 9 was a claim that hearsay was erroneously admitted. [The] [p]etitioner's claim was vague and conclusory, because he did not allege the specific instances of hearsay."); see also Adams, 897 F.2d at 333 ("We do not believe that 28 U.S.C. § 2254 or the Section 2254 Rules require the federal courts to review the entire state court record of habeas corpus petitioners to ascertain whether facts exist which support relief. Requiring such an exhaustive factual review of entire state court records would pose an insuperable burden on already strained judicial resources."); Amaro v. Cameron, Civil Action No. 09-343, 2009 WL 6567090, at *9 (E.D. Pa. July 31, 2009) (unpublished) ("While we must give a liberal reading to a pro se litigant's pleadings, it is not the job of a habeas court to comb the record and sift for facts that may exist to support a bare allegation and then engage in an effort to construct a potential claim on his behalf." (internal citation omitted)), recommendation adopted, 2010 WL 2330280 (E.D. Pa. June 3, 2010) (unpublished).[9]

---

[9] Nor did Petitioner clarify such matters in his summary judgment response, which (in discussing Ground Three) merely refers generically to "hearsay testimony" (Docket Entry 22 at 14), "contradictory testimony of several witnesses regarding conversations with [his] wife" (id. at 15), "hearsay testimonials" (id.), and "statements allegedly made by [his wife] out of court, without a third-party witness" (id.). At one point, the discussion of Ground Three in
(continued...)

Alternatively, in moving for summary judgment, Respondent correctly has observed that a procedural bar applies to Ground Three because, to the extent Petitioner raised the instant Sixth Amendment claim on direct appeal, he did so only before the North Carolina Court of Appeals,[10] thereafter "fail[ing] to raise the substance of [G]round (3) in his notice of appeal/petition for discretionary review filed in the North Carolina Supreme Court" (Docket Entry 12 at 23). (Compare Docket Entry 12-4 at 32-34, with Docket Entry 12-7 at 8-19.) To satisfy Section 2254(b)(1)'s exhaustion requirement, Petitioner must have allowed the State of North Carolina "'the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.' To provide [the State of North Carolina] with this opportunity, '[Petitioner] must "fairly present" his claim in each appropriate state court, thereby alerting that court to the federal nature of the claim.'" Jones v.

_____

[9](...continued)
Petitioner's summary judgment response does mention a witness ("Ms. Mandeville") by name, but without describing the specific, improper hearsay that she allegedly offered. (Id. (complaining that unidentified testimony by Mandeville "fail[ed] to meet accepted standards regarding indicia of reliability" because of her "admission that she misremembered the date originally given" while citing only to transcript page of that alleged admission (not to transcript page(s) of allegedly erroneously admitted hearsay testimony).) Further, a summary judgment response (or traverse) "is not the proper place to raise new facts. Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner must set forth in his petition 'the facts supporting each ground' for relief." Velasquez v. Gipson, No. SA CV 12-1078(JSL), 2013 WL 3381371, at *9 n.4 (C.D. Cal. July 8, 2013) (unpublished) (emphasis added); see also Quackenbush v. Tilton, No. 07CV413W(WMC), 2008 WL 183710, at *6 (S.D. Cal. Jan. 18, 2008) (unpublished) ("Facts must be stated, in the petition, with sufficient detail to enable the Court to determine, from the face of the petition, whether further habeas corpus review is warranted. Moreover, the allegations should be sufficiently specific to permit the respondent to assert appropriate objections and defenses." (internal citations omitted) (emphasis in original)).

[10] The North Carolina Court of Appeals rejected Petitioner's hearsay-related attack(s) on his conviction. Petrick, 186 N.C. App. at 602-04, 652 S.E.2d at 692-93.

Sussex I State Prison, 591 F.3d 707, 712 (4th Cir. 2010) (quoting Baldwin v. Reese, 541 U.S. 27, 29 (2004)) (internal ellipses omitted) (emphasis added). Accordingly, a procedural bar arises as to Ground Three because Petitioner failed to "raise his claim before every available state court, including those courts – like the [North Carolina Supreme Court] – whose review is discretionary," id. at 713 (citing O'Sullivan, 526 U.S. at 847) (emphasis added), and Petitioner's time to seek review in the North Carolina Supreme Court passed long ago (indeed, even before he filed his instant Petition), see Reid v. Vaughan, No. 1:10CV452, 2011 WL 1135143, at *3 (M.D.N.C. Mar. 24, 2011) (unpublished) (discussing timing rules for discretionary petitions to the North Carolina Supreme Court and citing O'Sullivan, 526 U.S. at 848), recommendation adopted, slip op. (M.D.N.C. May 2, 2011).[11]

To avoid the foregoing procedural bar, Petitioner's summary judgment response asserts as follows:

> To any extent where I may be in technical violation of procedure, and thus subject to procedural bar, I claim exception and ask this Court to exercise its discretion and excuse such technical violations under both my claim of ineffective assistance of appellate counsel and the cause and prejudice standard.

---

[11] Petitioner's MAR also did not raise any claim of erroneous admission of hearsay testimony or any related claim of ineffective assistance of appellate counsel (for failing to pursue any hearsay-based issue before the North Carolina Supreme Court). (See Docket Entry 12-10.) If Petitioner now attempted to remedy such failure(s), he would face mandatory imposition of the procedural bar in N.C. Gen. Stat. § 15A-1419, see Rose v. Lee, 252 F.3d 676, 683 (4th Cir. 2001), and thus a further procedural bar arises in this Court as to Ground Three, see Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). Respondent's summary judgment brief references these additional aspects of Petitioner's default (Docket Entry 12 at 22-25) and Petitioner's response does not offer any rationale that could overcome them (see Docket Entry 22 at 14-16).

<u>The cause is asserted under that ineffective assistance</u>
<u>claim</u>.

(Docket Entry 22 at 14 (emphasis added).)  Petitioner's assertion in this regard lacks merit because his ineffective assistance of counsel claim (Ground Eight of the Petition) does not allege (much less provide factual support showing) that his appellate attorney rendered constitutionally inadequate representation by failing to pursue before the North Carolina Supreme Court a Sixth Amendment claim for admission of improper hearsay reports of statements made by Petitioner's wife; to the contrary, Ground Eight (like the parallel ineffective assistance of counsel claim in Petitioner's MAR (<u>see</u> Docket Entry 12-10 at 12-14)) focuses only on his appellate attorney's allegedly deficient litigation of issues related to the cadaver dog handler's testimony.  (<u>See</u> Docket Entry 1 at 28; <u>see also</u> Docket Entry 22 at 27.)  Petitioner thus has failed to show "cause" sufficient to satisfy <u>Coleman</u>'s "cause and prejudice" exception to his procedural default of Ground Three, particularly given that an appellate attorney need not pursue every non-frivolous issue and instead may winnow the assignments of error, <u>see</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 750-54 (1983).[12]

In sum, Petitioner cannot secure habeas relief via Ground Three.

---

[12] Again (as discussed in Footnote Eight above), in seeking to overcome any procedural bar, Petitioner has not invoked the "fundamental miscarriage of justice" exception noted in <u>Coleman</u> (<u>see</u> Docket Entry 22 at 6-28) and, therefore, the Court need not address that issue, <u>see</u> <u>Coleman</u>, 501 U.S. at 757; <u>Thompkins</u>, 698 F.3d at 987 n.5.  Nor has Petitioner anywhere established circumstances that would meet the demanding "miscarriage of justice" test (as described in <u>Schlup</u>).  (<u>See</u> Docket Entry 1 at 22-28; Docket Entry 22 at 6-28; Docket Entry 32 at 1-4.)

### D.  Ground Four – Erroneous Admission of Prior Bad Act Evidence and Character Opinion Testimony

Fourthly, the Petition declares that "[t]he trial court violated [Petitioner's] constitutional rights under the Sixth Amendment and committed plain error in admitting evidence of alleged prior acts of dishonesty and bad character opinion testimony." (Docket Entry 1 at 24.)  The Petition, however, does not identify a single witness who allegedly testified improperly about Petitioner's past conduct or character. (See id.)  Nor does the Petition offer any other details about any such testimony. (See id.)  Accordingly, for the same reasons (and based on the same authority) outlined in Subsection IV.C., Ground Four fails as a matter of law under Section 2254 Rule 2(c).[13]

In the alternative, (in light of the authority discussed in Subsection IV.C.) Respondent validly has interposed a defense that "[G]round (4) is procedurally defaulted under O'Sullivan for Petitioner's failure to raise [G]round (4) in his notice of appeal/ petition for discretionary review filed in the North Carolina Supreme Court" (Docket Entry 12 at 29).  (See Docket Entry 12-7 at

---

[13] Petitioner's inclusion in his summary judgment brief of some details as to this claim (see Docket Entry 22 at 16-18) does not alter the above conclusion because a summary judgment response (like a traverse) "is not the proper place to raise new facts.  Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner must set forth in his petition 'the facts supporting each ground' for relief." Velasquez v. Gipson, No. SA CV 12-1078(JSL), 2013 WL 3381371, at *9 n.4 (C.D. Cal. July 8, 2013) (unpublished) (emphasis added); see also Quackenbush v. Tilton, No. 07CV413W(WMC), 2008 WL 183710, at *6 (S.D. Cal. Jan. 18, 2008) (unpublished) ("Facts must be stated, in the petition, with sufficient detail to enable the Court to determine, from the face of the petition, whether further habeas corpus review is warranted.  Moreover, the allegations should be sufficiently specific to permit the respondent to assert appropriate objections and defenses." (internal citation omitted) (emphasis in original)).

8-19.)[14]  By way of response, Petitioner's summary judgment brief states only, "[r]egarding the issue of default, I proffer and rely upon the same argument given in Ground 3." (Docket Entry 22 at 16.)  As detailed in Subsection IV.C., Petitioner sought to avoid summary judgment due to his procedural default on Ground Three by asserting that his ineffective assistance of appellate counsel claim in Ground Eight provided "cause" adequate to meet Coleman's "cause and prejudice" exception.  That assertion failed because Ground Eight (like the parallel claim for ineffective assistance of counsel set forth in Petitioner's MAR) addressed only purported professional negligence by his appellate attorney related to the cadaver dog handler's testimony.  That same fact dooms Petitioner's instant effort to overcome the procedural bar applicable to Ground Four (i.e., Ground Eight does not purport to show (much less show) that Petitioner's appellate attorney provided ineffective assistance by failing to present the substance of Ground Four to the North Carolina Supreme Court).  This Court, therefore, denies Ground Four due to procedural default as well.

---

[14] At the first step of his direct appeal, Petitioner "argue[d] that the trial court abused its discretion when it overruled his objections to testimony of his prior acts of dishonesty and bad character. [Petitioner] also argue[d] the trial court committed plain error in failing to strike such testimony ex mero motu." Petrick, 186 N.C. App. at 604, 652 S.E.2d at 693. The North Carolina Court of Appeals, however, "disagree[d] . . . [because] evidence of [Petitioner's] financial dealings with other people, depletion of the victim's bank accounts, violent acts toward the victim, and his adulterous relationships . . . tended to show [his] motive, intent, preparation, plan, absence of mistake, and knowledge. The relevancy of this evidence outweighs its danger of unfair prejudice." Id. (internal citations omitted).

**E.  Ground Five – Total Breakdown of Adversarial Process**

The Petition further alleges that "[t]he trial court violated [Petitioner's] constitutional rights under the Sixth Amendment and committed plain error by allowing a complete breakdown of the adversarial process." (Docket Entry 1 at 25.)  The factual support cited in the Petition for this claim appears as follows:

> [T]he prosecution introduced, not only just prior to trial but after the parties had rested their case in chief, circumstantial and highly prejudicial evidence of highly questionable provenance allegedly found in [Petitioner's] computers. [Petitioner] was given almost no time to verify and prepare to meet that evidence, and no access at all to the actual hard drives or even certified copies, the prosecution actually misstating their location in open court in order to deny access. The [trial] court also ordered [Petitioner] to give the State advance notice of the searches [his] expert was conducting on the incomplete copies provided, having repeatedly turned a deaf ear to [Petitioner's] complaints that the State was providing last-minute discovery of material which should have been provided almost three years earlier.

(Id.)

Respondent has moved for summary judgment "on [G]round (5) because it is procedurally defaulted.  This is because Petitioner failed to raise the issue in his notice of appeal/petition for discretionary review filed in the North Carolina Supreme Court." (Docket Entry 12 at 31-32.)  The record confirms that Petitioner did not pursue the substance of Ground Five before the North Carolina Supreme Court on direct appeal.  (See Docket Entry 12-7 at

8-19.)[15]  Accordingly, for the reasons discussed in Subsection IV.C., a procedural bar also applies to Ground Five.

Petitioner's summary judgment brief does not contest the existence of the foregoing procedural bar and seeks to overcome it only by "again respectfully refer[ring] the Court to [his] argument in Ground 3."  (Docket Entry 22 at 19.)  As set out in Subsection IV.C., in connection with Ground Three, Petitioner contends that his ineffective assistance of appellate counsel claim in Ground Eight provides the requisite "cause" for purposes of Coleman's "cause and prejudice" exception to procedural default.  The discussion in Subsection IV.C. explains that said contention fails because Ground Eight (and the parallel ineffective assistance claim in Petitioner's MAR) reference only purported inadequate representation by his appellate attorney in regards to the cadaver dog handler's testimony.  That circumstance similarly defeats Petitioner's instant effort to show "cause" excusing his procedural default as to Ground Five.  Accordingly, the Court will enter summary judgment for Respondent on Ground Five.

## F.  Ground Six – Knowing Presentation of Perjured Testimony

In Ground Six, the Petition states that "[Petitioner's] constitutional rights under the Sixth and Fourteenth Amendments

---

[15] In initially pursuing his direct appeal before the North Carolina Court of Appeals, Petitioner "argue[d] that several rulings by the trial court 'sabotaged the adversarial process to the extent that the result of the trial [wa]s presumptively unreliable.'"  Petrick, 186 N.C. App. at 605, 652 S.E.2d at 693.  The rulings challenged by Petitioner in that regard included "denying his motions for sanctions against the State for failing to timely provide discovery . . . [and] requiring him to provide the State with information on the searches he intended to perform on certain computers[.]"  Id. at 605, 652 S.E.2d at 693-94.  "This assignment of error [wa]s overruled."  Id. at 606, 652 S.E.2d at 694.

were violated when perjured testimony was knowingly presented to the jury." (Docket Entry 1 at 26.) The entirety of the Petition's factual support for Ground Six consists of the following:

> The cadaver dog handler Roy McNeill gave testimony during trial which directly contradicted that given in a previous voir dire hearing. When asked about his previous answers during cross-examination, he denied having made them, a perjured statement which went uncorrected by the prosecution.

> Since my trial, Mr. McNeill has given testimony in another trial where he made statements regarding both his work on my case and his record keeping which provide further proof of his perjury during my trial.

(Id.) The Petition thus does not describe in any meaningful way the alleged perjurious trial testimony, the alleged prior, contradictory voir dire testimony, or the subsequent trial testimony in another case that allegedly proved McNeill committed perjury before Petitioner's jury, all contrary to the requirements of Section 2254 Rule 2(c) (discussed in Subsection IV.C.).

Ground Six therefore fails as a matter of law, for reasons well-expressed by another court more than two decades ago:

> In the abstract, this allegation raises an issue of utmost concern: a prosecutor's knowing use of perjured testimony is one of the classic grounds for the issuance of a writ of habeas corpus. Yet [the instant claim] is nothing more than an abstract allegation. Petitioner has offered no elaboration of any kind. In particular, he has failed to identify what portions of the [cited witness's] testimony are allegedly perjurious, and has provided no factual support for his supposition that the government countenanced any such perjury. Given its wholly conclusory nature, this charge [i]s properly subject to summary dismissal.

Andiarena v. United States, 967 F.2d 715, 719 (1st Cir. 1992) (internal citation and quotation marks omitted).

Numerous courts across the country, including in the Fourth Circuit, have reached the same conclusion in analogous contexts. See, e.g., Schlang v. Heard, 691 F.2d 796, 799 (5th Cir. 1982) ("[The petitioner] alleges that the State's principal witness perjured himself . . . . Mere conclusory statements do not raise a constitutional issue in a habeas case."); Daly v. Chavez, No. CV11-1818DSF(DTB), 2013 WL 5951932, at *19 (C.D. Cal. Nov. 5, 2013) (unpublished) ("[The] [p]etitioner has failed to establish that any perjured testimony was used to obtain his conviction. . . . [V]ague and conclusory allegations do not warrant habeas relief as they do not meet the specificity requirement."); Philbert v. Brown, No. 1:11CV1805(NCG), 2012 WL 4849011, at *9 (E.D.N.Y. Oct. 11, 2012) (unpublished) ("[The petitioner] alleges that the prosecutor knowingly allowed perjured testimony; however, this allegation is vague, conclusory, and unsupported. . . . [The petitioner] offers neither any description of the testimony he alleges was false, nor any support for his claim that the [prosecutor] had knowledge of the alleged perjury. Such vague allegations which fail to offer even the most cursory description of the alleged errors do not amount to a viable habeas claim, nor do they establish knowing introduction of perjury by the prosecution. [The petitioner's] claim for habeas relief based on alleged allowance of perjured testimony therefore fails." (internal brackets, citations, and quotation marks omitted)); Boan v. Warden of Lee Corr. Inst., Civil Action No. 2:11-2078-RBH-BHH, 2012 WL 4069685, at *19 (D.S.C. July 31, 2012) (unpublished) ("[A]

defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed perjured. . . . [The] [p]etitioner's conclusory allegations of perjury do not meet this standard[.]" (internal quotation marks omitted)), recommendation adopted in relevant part, 2012 WL 4069682 (D.S.C. Sept. 17, 2012) (unpublished); Gill v. Harrington, No. CV09-9508DOC(JCG), 2011 WL 6210326, at *6 (C.D. Cal. Nov. 15, 2011) (unpublished) ("[The] [p]etitioner fails to specify which testimony was false or perjured, and . . . conclusory allegations that are not supported by specific facts do not warrant habeas relief."), recommendation adopted, 2011 WL 6210372 (C.D. Cal. Dec. 14, 2011) (unpublished); Smith v. Dretke, Civil Action No. H-04-4122, 2006 WL 1852117, at *6 (S.D. Tex. June 30, 2006) (unpublished) ("[A petitioner] must indicate specifically what statements were false and why, and show that the State was aware of the false statements. Here, [the petitioner] does not specifically assert what statements were false, and does not provide any evidence in support of his allegations. Therefore, his claims are without merit.); Beasley v. Holland, 649 F. Supp. 561, 566 (S.D.W. Va. 1986) ("Mere conclusory charges of perjury and the knowing use of the alleged perjury is [sic] insufficient to warrant a hearing or habeas relief."), appeal dismissed, No. 86-7411, 841 F.2d 1122 (table), 1988 WL 16914 (4th Cir. Feb. 29, 1988) (unpublished).[16]

---

[16] This view coheres with the Fourth Circuit's more general directive that "[u]nsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing," Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992), abrogated on other grounds, Gray v. Netherland, 518 U .S. 152, 165-66 (1996).

Once Respondent moved for summary judgment based on the conclusory nature of Ground Six (see Docket Entry 12 at 34), Petitioner identified with some greater specificity the testimony on which he purported to rely (see Docket Entry 22 at 23-25). That belated effort cannot save Ground Six because a summary judgment response (like a traverse) "is not the proper place to raise new facts. Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner must set forth in his petition 'the facts supporting each ground' for relief." Velasquez v. Gipson, No. SA CV 12-1078(JSL), 2013 WL 3381371, at *9 n.4 (C.D. Cal. July 8, 2013) (unpublished) (emphasis added); see also Quackenbush v. Tilton, No. 07CV413W(WMC), 2008 WL 183710, at *6 (S.D. Cal. Jan. 18, 2008) (unpublished) ("Facts must be stated, *in the petition*, with sufficient detail to enable the Court to determine, from the face of the petition, whether further habeas corpus review is warranted." (emphasis in original)). Ground Six thus fails.

The requirement in Section 2254 Rule 2(c) that a petition include the factual predicate for a claim exists not only to preserve judicial resources, see Adams, 897 F.2d at 333, but also "to permit the respondent to assert appropriate objections and defenses," Quackenbush, 2008 WL 183710, at *6. In this case, by waiting until after Respondent answered the Petition and sought summary judgment to identify the specific testimony at issue in Ground Six, Petitioner deprived Respondent of an opportunity to assert a procedural bar to part of Ground Six (as refined in

Petitioner's summary judgment brief). In that regard, Petitioner's summary judgment brief cites three instances of supposed perjury:

1) "During voir dire McNeill corroborated other testimony given by a crime scene investigator that [Petitioner's] two frightened kittens were hiding beneath the bed when the [cadaver dog] search took place (Tp 804). At trial, however, [McNeill] both changed his testimony and categorically denied having made the initial statement (Tp 1309)." (Docket Entry 22 at 23.);

2) "At voir dire, [McNeill] made a clear statement . . . that, in the absence of any actual organic material, the scent left by a cadaver would be gone within hours or days of the body being removed (Tpp 806-807). Once his testimony was ruled admissible, McNeill substantially changed his testimony at trial in order to conform to the State's theory of the case. He now claimed that, even without the presence of organic matter, the scent would remain for 'many, many years' (Tp 1315)." (Docket Entry 22 at 23-24; see also id. at 24 ("When [McNeill] changed his testimony [on cadaver odor], then denied having done so, it became perjury.").); and

3) "At [Petitioner's] trial McNeill stated that he kept accurate records and that these records did exist . . . [and] could be produced . . . for the prosecution (Tpp 797, 1305). In the Anderson trial, however, [McNeill] stated that his records were no longer available; they had been destroyed, in two separate locations, by storm damage during Hurricane Ivan. . . . [T]his 'discrepancy' indicates flat-out perjury on McNeill's part.

Hurricane Ivan occurred in September of 2004; [Petitioner's] trial was in October of 2006 [sic]." (Docket Entry 22 at 24-25.)[17]

Petitioner's MAR also asserted that "[t]he cadaver dog handler, Roy McNeill, committed perjury." (Docket Entry 12-10 at 7.) However, unlike Petitioner's above-quoted summary judgment response, his MAR did <u>not</u> list item number two above (i.e., McNeill's testimony about how long a cadaver's smell would remain somewhere) as an example of any such perjury. (<u>See</u> <u>id.</u> at 7-10.) Because Petitioner failed to include that allegation of perjury in his MAR, he has not exhausted any federal constitutional claim based on that allegation of perjury. Moreover, if Petitioner sought to present any such allegation of perjury in state court at this point, a mandatory procedural bar would arise under N.C. Gen. Stat. § 15A-1419, <u>see</u> <u>Rose v. Lee</u>, 252 F.3d 676, 683 (4th Cir. 2001), resulting in application of a procedural bar in this Court, <u>see</u> <u>Breard v. Pruett</u>, 134 F.3d 615, 619 (4th Cir. 1998). Under these circumstances, the Court finds that the interests of comity and judicial efficiency warrant sua sponte enforcement of the applicable procedural bar without hearing further from the parties, given the obvious nature of the default, the absence of any cause

---

[17] As the Petition acknowledges (Docket Entry 1, ¶ 2), Petitoner's trial occurred in 2005, not (as Petitioner indicated in the above-quoted passage) in 2006. Petitioner's above-quoted "Tp" and "Tpp" citations refer to the transcript of his trial proceedings (consisting of 16 volumes, encompassing 16 days between October 31 and November 29, 2005, with continuous pagination throughout), which Respondent filed (and served on Petitioner) in hard-copy form pursuant to Rule 5(c) of the Rules Governing Section 2254 Cases (<u>see</u> Docket Entry 13). Because the record also includes some additional transcripts from some other proceedings that took place before October 31, 2005, the Court will use the term "Trial Tr." for citations to the 16-volume transcript of the trial proceedings.

that plausibly might excuse the default,[18] and Petitioner's failure to comply with Section 2254 Rule 2(c) in originally presenting Ground Six. See Yeatts v. Angelone, 166 F.3d 255, 261-62 (4th Cir. 1999) (recognizing that "interests of comity may counsel a federal habeas court to ignore the failure of a state to assert a defense founded upon procedural default," particularly where (1) "judicial efficiency is advanced," such as when "a petitioner obviously has defaulted," and (2) the record does not reflect that "a state intentionally has declined to pursue the defense").[19]

In any event, the three instances of purported perjury cited in Petitioner's summary judgment response (including item number two above, which the Court has deemed procedurally defaulted) fall short of establishing a federal constitutional violation.[20] Pursuant to Napue v. Illinois, 360 U.S. 264 (1959), "a State denies a defendant due process by knowingly offering or failing to correct false testimony.  A Napue claim requires a showing of the falsity and materiality of testimony and the prosecutor's knowledge of its falsity."  Basden v. Lee, 290 F.3d 602, 614 (4th Cir. 2002).

---

[18] As documented in Subsections IV.C., IV.D., and IV.E., despite Respondent invoking procedural bar as to numerous claims, Petitioner has opted against offering any "cause" for his defaults beyond his inapposite citations to Ground Eight of his Petition.  Further, Petitioner's filings establish that he neither has attempted to meet nor could meet the "miscarriage of justice" exception. (See Docket Entry 1 at 22-28; Docket Entry 22 at 6-28; Docket Entry 32 at 1-4.)

[19] Petitioner also arguably defaulted any claim as to at least the first two of the above-referenced instances of perjury by failing to present it on direct appeal; however, given the other evident deficiencies of the instant claim(s), the Court declines to address such matters further.

[20] Because Petitioner did not exhaust a claim related to the second alleged instance of perjury, the Court generally cannot grant relief on any such claim, 28 U.S.C. § 2254(b)(1), but can deny it on the merits, 28 U.S.C. § 2254(b)(2).

Petitioner has shown neither that McNeill gave false testimony nor that the prosecutor knew of any falsity.

As to the first alleged occurrence of perjury cited in Petitioner's summary judgment brief, the record reflects that, during voir dire, Petitioner and McNeill had this exchange:

> Q. Are you aware that there were two cats under the bed at the time of the search?
>
> A. Yes, sir. [My dog, Kaiser,] paid them no attention.

(Trial Tr. 804.) Before the jury, McNeill first testified that "[t]he cats were not under the bed" and then, when Petitioner suggested that prior testimony (from McNeill or someone else) indicated otherwise, McNeill asked if he previously had testified to the contrary. (Trial Tr. 1309.) When the trial court posed clarifying questions, McNeill stated that he "ha[d] no knowledge" of whether "the cats were under the bed when [he] conducted the search." (Trial Tr. 1311.) Finally, during further examination by Petitioner, McNeill explained: "As far as I know, there were no cats in the bedroom, because I never saw them in the bedroom. If they were, the dog never alerted on them." (Trial Tr. 1312.)

From this sequence of events, Petitioner concludes that McNeill "both changed his testimony and categorically denied having made the initial statement" (Docket Entry 22 at 23); in fact, the record reflects that, before the jury, rather than "categorically den[ying]" anything about his voir dire testimony, McNeill expressed confusion about what he previously said about the presence of cats. Further, to the extent McNeill "changed" his

testimony, he did so in a manner fully consistent with good-faith clarification. Specifically, during voir dire, McNeill (perhaps too casually) answered affirmatively to a vague question about his current "aware[ness]" of a past historical fact, while at the same time unambiguously testifying that his dog did not react to any cats. Subsequently, before the jury, McNeill made clear that he lacked personal knowledge about the location of any cats at the time of the search, but reiterated the main point he made in voir dire, i.e., that his dog did not alert to any cats. These circumstances do not establish that McNeill committed perjury, much less that the prosecutor knew that McNeill had done so. See Tapia v. Tansy, 926 F.2d 1554, 1563 (10th Cir. 1991) ("Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony.").[21]

Petitioner's second example of purported perjury similarly lacks merit. First, contrary to the characterization in Petitioner's summary judgment response, during voir dire, McNeill repeatedly refused to give a definitive answer as to how long the scent of a cadaver would remain in a location after removal of the body because of the numerous, relevant, variable factors. (See Trial Tr. 805-08.) Second, McNeill's testimony before the jury

---

[21] In his MAR, Petitioner raised a Napue claim based on this same alleged instance of perjury (see Docket Entry 12-10 at 7) and the Superior Court summarily denied that claim on the merits (see Docket Entry 12-11 at 1). As a result, Section 2254(d)'s deferential review standard governs this aspect of Ground Six; however, for reasons stated above, a Napue claim predicated on this portion of McNeill's testimony falls short under even a de novo review standard.

made the same point.  (See, e.g., Trial Tr. 1315-16 ("If a body has laid in an area for just a short time, it will evaporate real quick.  But if a body has laid and decomposed in one area for a great number of days, . . . it will be there for a long long period of time. . . .  In a confined space it would depend on the temperature, and how tight the rooms are.").)  Accordingly, Petitioner has not shown any false testimony by McNeill on this subject, let alone any knowledge of any falsity by the prosecutor.

The third instance of perjury listed in Petitioner's summary judgment brief (regarding record-keeping) fares no better.  Before the jury, this colloquy occurred between Petitioner and McNeill:

> Q.   Do you actually have your training records here with you, by the way?
>
> A.   No, sir, I don't.  It wasn't requested.  All of [Kaiser's] records are here as far as --
>
> Q.   Training records are available if we request them. You do keep training records on Kaiser?
>
> A.   If it's requested.

(Trial Tr. 1305.)  Petitioner's summary judgment response asserts that, during the later "Anderson trial, however, [McNeill] stated that his records were no longer available; they had been destroyed, in two separate locations, by storm damage . . . in September of 2004 [i.e., before Petitioner's trial]."  (Docket Entry 22 at 24-25.)  The record contains no support for this characterization of McNeill's testimony at the "Anderson trial."[22]

_____

[22] In an affidavit submitted by Petitioner, his appellate attorney averred to having obtained "a transcript of the *voir dire* and jury testimony of Mr. McNeill in that case, *State v. Anderson*[,] . . . [and having] mailed that
(continued...)

-32-

Petitioner thus has failed to provide evidence sufficient to support a finding that, during his trial, McNeill testified falsely about the availability of any records. Further, even if McNeill gave different testimony about the state of his records during the Anderson case than he previously gave during Petitioner's trial, Petitioner has offered no evidence to show that, at the time of his trial, the prosecutor knew McNeill had testified falsely on this subject; instead, Petitioner has asked the Court to find such knowledge by way of rank speculation. (See id. at 25.) The Court declines that request. See Skains v. California, 386 F. App'x 620, 621-22 (9th Cir. 2010) ("A Napue claim will succeed only if the prosecution knows or should have known that the testimony was false, whereas [the petitioner] offers only speculation that the prosecutor knew or should have known that [the witness's] impeachment testimony was inaccurate at the time it was given.").[23]

For all these myriad reasons, Ground Six warrants no relief.

[22](...continued)
transcript to [Petitioner] after his appeal was concluded." (Docket Entry 3 at 2.) Petitioner, however, did not include a copy of that transcript with his Petition. (See Docket Entry 1.) The Court thereafter noted the apparent absence from the record of this case of any transcript from the Anderson case and advised Petitioner that he "may wish to submit a copy [of said transcript] or point to its location in the record if he wishe[d] the Court to consider such evidence at summary judgment." (Docket Entry 27 at 2 n.1.) Despite those events, Petitioner's summary judgment brief did not attach any such transcript (see Docket Entry 22) or even quote from/cite to it (see id. at 24-25).

[23] Petitioner's MAR contained a Napue claim premised on the alleged conflict between McNeill's testimony about his records at Petitioner's trial and the Anderson trial (see Docket Entry 12-10 at 4-5, 10), which claim the Superior Court summarily denied on the merits (see Docket Entry 12-11 at 1). Although this Court therefore need conduct only the limited review prescribed by Section 2254(d) as to this part of Ground Six, the discussion above establishes the deficiency of said sub-claim even if considered de novo.

## G.  Ground Seven – Withholding of Evidence

For its seventh ground, the Petition complains that "[Petitioner's] constitutional rights under the Fifth, Sixth and Fourteenth Amendments were violated when evidence both favorable and critically important to the defense was witheld [sic] by the prosecution." (Docket Entry 1 at 27.) As factual support for this claim, the Petition states:

> After [Petitioner's] trial and conviction, the cadaver dog handler Mr. McNeill gave testimony in another trial which revealed for the first time a second, separate cadaver dog search of [Petitioner's] home and automobile by another dog and handler. This evidence [of a second cadaver dog search] was deliberately witheld [sic] by the prosecution and, if known and available to the defense, would have impeached and/or refuted Mr. McNeill's testimony. The State has not denied having witheld [sic] the evidence.

(Docket Entry 1 at 27; see also Docket Entry 12-10 at 10-12 (raising same claim in MAR and stating that "second dog handler was referred to by the name Blankenship"); Docket Entry 12-11 at 1 (summarily denying MAR); (Docket Entry 22 at 26 ("During his testimony in Anderson, McNeill made reference to a second cadaver dog search of [Petitioner's] home and automobile by a party named Blankenship[.]").)

By separate discovery motion, Petitioner requested production by Respondent of "[a]ny and all materials related to, referencing or directly resulting from any cadaver dog search of [his] home and/or automobile by any party other than Mr. Roy McNeill . . . ." (Docket Entry 5 at 2.) Respondent did not file a response to that discovery motion (see Docket Entry 27 at 4) and, in moving for

summary judgment, "did not state whether or not a second [cadaver dog] search occurred, what was found if it did occur, or what records, if any, existed, although she faulted Petitioner for not providing proof of the [alleged second cadaver dog] search" (id. at 3 (citing Docket Entry 12 at 37)). Respondent also argued that "[a]ny evidence Petitioner may now submit, not submitted to the state MAR court in support of [a claim matching Ground Seven] cannot be considered on federal habeas review." (Docket Entry 12 at 37 (citing Wilson v. Moore, 178 F.3d 266, 272-73 (4th Cir. 1999)).) However, "Respondent did not explain how Petitioner was supposed to provide proof of the second [cadaver dog] search, particularly when he sought, but did not receive, an evidentiary hearing in the state courts while pursuing [his MAR] on his claim of withheld evidence." (Docket Entry 27 at 3 (citing Docket Entry 12-10 at 15 and Docket Entry 12-11 at 1).) Given the circumstances presented, the Court concluded that Petitioner had shown good cause under Rule 6 of the Rules Governing Section 2254 Proceedings to require Respondent to "either produce any non-privileged materials related to any second cadaver dog search to Petitioner and the Court or certify that no such materials exist and/or that no second cadaver dog search of Petitioner's property occurred." (Id. at 6.)

Respondent timely complied with that directive. (See Docket Entries 31, 31-1 - 31-17.)[24] Her response demonstrates that:

---

[24] In the interim between the Court's order requiring Respondent to provide the specified discovery and her compliance therewith, the United States Supreme Court issued Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388 (2011). In that decision, the Supreme Court made clear that, "[a]lthough state prisoners may
(continued...)

1) Petitioner's then-counsel requested discovery, including regarding any cadaver dog searches (see Docket Entry 31-2);

2) the prosecutor responded by disclosing a number of documents regarding McNeill (a few of which referenced his dog Kaiser) (Docket Entries 31-3 - 31-5);

3) the prosecutor then "filed another supplemental response to Petitioner's discovery requests indicating that certain items were available in the Durham District Attorney's office for inspection, including photocopies of Books 1, 2, and 3 of the police's

---

[24](...continued)
sometimes submit new evidence in federal court, [the Antiterrorism and Effective Death Penalty Act of 1996's] statutory scheme [as codified in part in Section 2254] is designed to strongly discourage them from doing so." Id. at ___, 131 S. Ct. at 1401. In light of that principle, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Id. at ___, 131 S. Ct. at 1400 (emphasis added). As noted above, the MAR court denied on the merits the same claim Petitioner now has presented in Ground Seven. Under Cullen, that fact thus generally would preclude Petitioner from relying on any evidence produced for the first time in this Court (and not previously presented to the MAR court). However, prior to Cullen, the Fourth Circuit had held that, if "the petitioner offers, for the first time in federal habeas proceedings, new, material evidence that the state court could have considered had it permitted further development of the facts, an assessment under § 2254(d) may be inappropriate. . . . [W]hen a state court forecloses further development of the factual record, it passes up the opportunity that exhaustion ensures. If the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate . . . ." Winston v. Kelly, 592 F.3d 535, 555 (4th Cir. 2010). After Cullen, the Fourth Circuit reaffirmed that position. See Winston v. Pearson, 683 F.3d 489, 498-503 (4th Cir. 2012). The Court confesses to having some difficulty reconciling the Supreme Court's directives in Cullen with the Fourth Circuit's instructions in Winston I and Winston II, particularly where, as here, the petitioner sought and the MAR court declined to permit an evidentiary hearing. Fortunately, the Court need not undertake such reconciliation in this case for two reasons. First, neither in the argument submitted with the discovery ordered by the Court (see Docket Entry 31 at 4-6), nor in any subsequent filing (see Docket Entries dated June 15, 2011, to present), has Respondent contended that Cullen precludes consideration of the new evidence produced. Second, as set forth in the remainder of Subsection V.G., Ground Seven fails as a matter of law even in light of the additional evidence and without application of the limits on review provided by Section 2254(d).

investigative report" (Docket Entry 31 at 2 (citing Docket Entry 31-7 at 2-3));[25]

4) "[w]ithin the files of the [Durham] District Attorney, [Respondent's counsel] located the notebooks of the investigative reports, including Book 1 . . . [and confirmed that,] [w]ithin that book, there was a section entitled 'K-9 Info' . . . [which included] emails regarding the canines and handlers, handwritten notes, and other documents" (id. at 2-3 (citing Docket Entries 31-8 - 31-10 and quoting Docket Entry 31-8 at 2));

5) one of the emails in the "K-9 Info" section of Book 1 came from "Charles A. Blankenship" to the prosecutor with the subject heading of "cadaver dog info" and included this language in its body: "Her [sic] is the info on the seminar that Both [sic] Roy and I attended. I had my K9 Shawnee with me but Roy did not have Kaiser yet." (Docket Entry 31-10 at 11);

6) one of the handwritten pages of notes in the "K-9 Info" section of Book 1 specifically referred to "McNeil - Kyser [sic]" and "Blankenship - Shawnee" and concluded with the statement "2 dogs hit car separate times" (id. at 13);

7) "[i]n another supplemental response to Petitioner's discovery request, . . . [the prosecutor] indicated that several documents were available for inspection in the District Attorney's

_____

[25] The prosecutor served that supplemental response on Petitioner's then-attorney. (See Docket Entry 31-7 at 3.)

files, including the Crime Scene Log" (Docket Entry 31 at 3 (citing Docket Entry 31-11));[26]

8) "[w]ithin the District Attorney's files concerning Petitioner's case, [Respondent's counsel] located a copy of the crime scene log for January 27, 2003" (id.); and

9) that "Crime Scene Log" (which identifies Petitioner's then-residence as the "LOCATION") lists (A) "C.A. Blankenship (Dog: Shawnee)" entering and exiting at "5:12 pm" and "5:19 pm," respectively (Docket Entry 31-12 at 2), (B) "Roy McNeal [sic] with dog" entering and exiting at "6:42" and "7:13," respectively (id. at 3), and (C) "Charles Blankenship w/Dog" entering and exiting at "7:13" and "7:25," respectively (id.).

In the face of this record, Petitioner states (in unsworn fashion) that he "has in [his] possession all of the discovery documents presented to the defense prior to and during [his] trial. A thorough review of all of these documents in the last 72 hours produced no trace of the [above-referenced handwritten note and crime scene log]." (Docket Entry 32 at 1-2.)[27] Petitioner then asserts that he "can only conclude that these documents were not given to the defense. . . . Whether intentional or not, the result was that the defense had no knowledge of Mr. Blankenship's

---

[26] The prosecutor served that supplemental response on Petitioner's then-attorney. (See Docket Entry 31-11 at 3.)

[27] Petitioner's unsworn statement does not explain what his phrase "presented to the defense" means (i.e., whether it purports to encompass only documents as to which the prosecutor provided copies to Petitioner's then-counsel and/or Petitioner or all documents which the prosecutor made available to Petitioner's then-counsel and/or Petitioner for review). Nor does said statement identify any basis by which Petitioner acquired personal knowledge about what documents the prosecutor made available to Petitioner's then-counsel for review.

participation and accordingly was denied access to testimony . . .
which could have served to impeach the prosecution's most important
witness at trial." (Id. at 2-3.) According to Petitioner, "[t]he
failure of the State to disclose critical impeachment evidence to
the defense . . . constitutes a clear Brady violation." (Id. at
3.) The Court rejects Petitioner's foregoing position.

Under Brady v. Maryland, 373 U.S. 83 (1963), "a State violates
a defendant's due process rights when it fails to disclose to the
defendant prior to trial 'evidence favorable to an accused where
the evidence is material.'" Basden, 290 F.3d at 608 (quoting
Brady, 373 U.S. at 87). "There are three fundamental components to
a Brady claim: (1) 'The evidence at issue must be favorable to the
accused, either because it is exculpatory, or because it is
impeaching'; (2) the 'evidence must have been suppressed by the
State'; and (3) the evidence must be material to the defense, that
is, 'prejudice must ensue.'" Walker v. Kelly, 589 F.3d 127, 137
(4th Cir. 2009) (quoting Strickler v. Greene, 527 U.S. 263, 281–82
(1999)) (internal brackets and ellipses omitted) (emphasis added);
see also Kyles v. Whitley, 514 U.S. 419, 434 (1995) ("[The]
touchstone of materiality [in the Brady context] is a reasonable
probability of a different result, and the adjective is important.
The question is not whether the defendant would more likely than
not have received a different verdict with the [suppressed]
evidence, but whether in its absence he received a fair trial,
understood as a trial resulting in a verdict worthy of confidence."
(internal quotation marks omitted)). "It is the petitioner's

burden to establish the three elements of a <u>Brady</u> violation[.]"
<u>Fullwood v. Lee</u>, 290 F.3d 663, 685 (4th Cir. 2003) (internal
citation omitted). Here, Petitioner has not met his burden as to
any of the three elements of his instant <u>Brady</u> claim.

Taking the second <u>Brady</u> claim element first, Petitioner has
not identified any proof that the prosecutor <u>suppressed</u> evidence
that Blankenship and his cadaver dog Shawnee conducted a search
related to Petitioner's case. Instead, the evidence adduced by
Respondent (detailed above) reflects that, prior to Petitioner's
trial, the prosecutor made available to Petitioner's then-attorney
documents that clearly showed Blankenship's (and Shawnee's)
participation in the investigation. Petitioner's unsworn assertion
that he presently lacks copies of the relevant documentation does
not prove otherwise. <u>See</u> <u>United States v. Bujilici</u>, Crim. Action
No. 12-231-1, 2014 WL 2112858, at *6 (W.D. La. May 19, 2014)
(unpublished) ("[The petitioner's] failure to provide any evidence
whatsoever on the [suppression] prong of the <u>Brady</u> inquiry is
fatal."); <u>Hume v. Stephens</u>, No. 2:11CV24, 2014 WL 988538, at *6
(N.D. Tex. Mar. 13, 2014) (unpublished) ("Bare accusations that the
prosecution failed to turn over some piece of evidence does not
entitle a petitioner to prevail on a habeas claim under <u>Brady</u>.");
<u>Harris v. United States</u>, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998)
("Conclusory allegations that the government 'suppressed' or
'concealed' evidence do not entitle [the petitioner] to relief; nor
do they suffice to entitle [him] to an evidentiary hearing on
whether documents were withheld."), <u>aff'd</u>, No. 98-2594, 216 F.3d

1072 (table), 2000 WL 730375 (2d Cir. June 2, 2000) (unpublished);
United States v. Upton, 856 F. Supp. 727, 746 (E.D.N.Y. 1994)
("[M]ere speculation by a defendant that the government has not
fulfilled its obligations under Brady is not enough to establish
that the government has, in fact, failed to honor its discovery
obligations." (internal citation omitted)); see also Crowe v.
Terry, 426 F. Supp. 2d 1310, 1341 (N.D. Ga. 2005) ("The State's
failure to make and provide copies of these reports is not a
violation of Brady.  Brady only prohibits 'suppression' of
evidence.  Counsel had access to the disputed files and thus there
was no Brady violation . . . ." (internal citation omitted)), aff'd
sub nom., Crowe v. Hall, 490 F.3d 840 (11th Cir. 2007).

Nor has Petitioner satisfied the "favorable" or "material"
elements of his Brady claim.  To the contrary, the new evidence
further inculpates Petitioner while lacking any clear off-setting
or alternative exculpatory or impeaching quality.  Specifically, as
detailed above, a handwritten note from the investigative file
documents that Blankenship's cadaver dog Shawnee, like McNeill's
cadaver dog Kaiser, alerted to the trunk of Petitioner's car.
"Since the evidence [in question] tended to inculpate [P]etitioner
and was neither facially exculpatory nor impeaching, [any] failure
to disclose this [evidence] during pretrial discovery does not
violate Brady."  Matthews v. Sheets, No. 1:08CV742, 2010 WL 537002,
at *20 (S.D. Ohio Feb. 11, 2010) (unpublished)), aff'd sub nom.,
Matthews v. Warden, Ross Corr. Inst., 502 F. App'x 561 (6th Cir.
2012), cert. denied, ___ U.S. ___, 133 S. Ct. 1736 (2013); see also

United States v. Johnson, 872 F.2d 612, 619 (5th Cir. 1989) ("Neutral or inculpating evidence is not within the purview of Brady."); United States ex rel. Knights v. Wolff, 713 F.2d 240, 246 (7th Cir. 1983) ("[T]he statements were not favorable to the accused, but rather inculpatory . . . . Accordingly there was no violation of the Brady rule." (internal citation omitted)).

Petitioner's reply contends that, with knowledge of Blankenship's (and Shawnee's) involvement in the investigation, Petitioner could have secured from Blankenship "testimony which, given the apparent negative results of his search of [Petitioner's] home and his possibly inconclusive result involving [Petitioner's] car, could have served to impeach the prosecutor's most important witness at trial [i.e., McNeill]." (Docket Entry 32 at 3; see also id. ("[The prosecution's other] evidence, consisting largely of hearsay testimony completely unrelated to a charge of murder, would not have been sufficient for conviction in the absence of Mr. McNeill's testimony.").) Petitioner, however, has not identified any evidence of "negative results of [any] search of [Petitioner's] home" by Blankenship and Shawnee. (Id.) Similarly, Petitioner has not cited any record material that suggests Shawnee's alert on the trunk of Petitioner's car constituted an "inconclusive result." (See id.) In other words, "[a]lthough [P]etitioner offers various theories to support his position [on the favorable and material elements of his Brady claim], his conclusory allegations and speculation . . . fail to meet the Brady standard." Godlock v. Fatkin, 84 F. App'x 24, 29 (10th Cir. 2003); see also United States

v. Aleman, 548 F.3d 1158, 1164 (8th Cir. 2008) ("[The defendant] only speculates that interviews of [the undisclosed] individuals would have provided evidence favorable to his defense, however, and mere speculation is not sufficient to sustain a Brady claim." (internal ellipses and quotation marks omitted)); Bujilici, 2014 WL 2112858, at *6 ("[The] [p]etitioner's bald assertion that he would not have been found guilty is insufficient to establish materiality under the third prong of Brady.").

Alternatively, even if the prosecutor suppressed evidence of Blankenship's (and Shawnee's) search and if evidence regarding that search would have impeached McNeill's testimony in some fashion (neither of which circumstances Petitioner has shown), Ground Seven would still founder on the materiality element. For Brady claims, "[the] touchstone of materiality is a reasonable probability of a different result . . . ." Kyles, 514 U.S. at 434 (internal quotation marks omitted). "As Kyles explains, whether evidence withheld is material is not a sufficiency of evidence test. But by the same token, post-Kyles [courts] do not ignore other evidence presented at trial in determining [their] confidence in the outcome." United States v. Ellis, 121 F.3d 908, 918 (4th Cir. 1997) (internal citation omitted). Here, the record does not bear out Petitioner's characterization of the evidence apart from McNeill's testimony as weak, but instead confirms that the prosecution presented a strong case against Petitioner independent of any cadaver dog-related evidence. In that regard, the evidence before the jury showed as follows:

In the summer of 2001, Petitioner (who lived in Durham) began a romantic relationship with Ann Johnston, a woman living in Atlanta, Georgia, whom he previously had known during their high school years. (Trial Tr. 1591-94.)[28] Petitioner did not disclose to Johnston the fact of his marriage to the victim, Janine Sutphen (Trial Tr. 1594),[29] even after proposing marriage to Johnston in February 2002, visiting her parents, setting a wedding date, and completing paperwork necessary to marry in the Episcopal Church (Trial Tr. 1596-97, 1604-05). Instead, Petitioner told Johnston that "he had a very brief marriage out in California, and that his wife had been killed by a drunk driver. He had also told [Johnston] that he had a marriage to somebody that [they] had both known . . . in high school . . . [which ended in] divorce . . . ." (Trial Tr. 1598.) Further, Petitioner "told [Johnston] that [he and the victim] had been friends, and they had been in a relationship, but it had not worked out." (Trial Tr. 1599-1600; see also Trial Tr. 1600 ("Q. . . . [D]id he tell you that he was living with [the victim] at the time he proposed to you? A. No.").) Petitioner and Johnston originally planned to marry in September 2002, but postponed the wedding due to health problems she experienced and agreed that, in January 2003, they would come up with a new date. (Trial Tr. 1601-02, 1606; see also Trial Tr.

---

[28] Johnston initially expressed confusion about whether her relationship with Petitioner began in the summer of 2001 or 2002 (see Trial Tr. 1592-93); however, later in her testimony, it became clear that they first resumed contact in the summer of 2001 (see Trial Tr. 1604-05).

[29] Petitioner married the victim in early 2001. (Trial Tr. 968.)

1610 (testifying that, in January 2003, Petitioner had indicated that he had begun making preparations "to move to Atlanta").)

Meanwhile, Eleanor Hennessey, a friend of the victim, who lived about eight townhouses down from Petitioner and the victim, testified that, although she generally saw and spoke to the victim regularly, she neither saw nor spoke to the victim from on or about January 5, 2003, to January 22, 2003, despite telephoning the victim's residence eight to ten times. (See Trial Tr. 1078-85; see also Trial Tr. 1090 (testifying that, prior to January 2003, she "talked to [the victim] or saw her about every other day").) On each of those eight to ten occasions, Petitioner answered the telephone and made some excuse as to why the victim could not speak to Hennessey. (Trial Tr. 1080-82.) Hennessey "asked each time if [Petitioner] would have [the victim] call [Hennessey], [but she] never heard back from [the victim]." (Trial Tr. 1082.)

Richard Evans, a business associate of the victim, similarly testified that, in December 2002, he spoke by telephone with the victim almost daily, but that, beginning January 6, 2003, he could not reach her by telephone to discuss an important presentation she had to make on January 22, 2003. (See Trial Tr. 1037-48.) From January 6 to 22, 2003, Evans telephoned the victim approximately "half a dozen" times." (Trial Tr. 1041; see also Trial Tr. 1042 ("There were a half dozen calls spaced out every couple of days.").) Each time, Petitioner answered, stating on the first few occasions that the victim could not talk because she "had the flu" and thereafter that she felt "[t]oo depressed to come to the

phone." (Trial Tr. 1041-43.) When asked if he had "ever seen any indication of [the victim experiencing] any level of depression," Evans responded "[n]one whatsoever." (Trial Tr. 1043.)

Christopher Sutphen, an adult son of the victim (Trial Tr. 1096), testified that he last spoke to her by telephone on December 28, 2002, from his home in Texas (Trial Tr. 1098). Beginning on or around January 9, 2003, after not having subsequent contact from the victim via the computer-based, instant messaging system they normally utilized and learning that his brother also had not heard from the victim, Christopher Sutphen began telephoning her residence. (Trial Tr. 1099-1100.) "At times [Petitioner] would answer . . . [and] said [the victim] was either too sick to come to the phone or she was asleep, or later stages he said she was too depressed to get out of bed." (Trial Tr. 1100.) "At th[at] point, [Christopher Sutphen] was very concerned, [his] mother wasn't a depressed person, there's no way she would have laid in bed by herself and dealt with the situation of depression. There's no way she wouldn't have been in contact with her sons . . . ." (Id.) In light of that concern, Christopher Sutphen "called more, left more messages, and subsequently talked to [Petitioner] on the phone a couple of times and was led to believe that she was still sick and would not come to the phone." (Trial Tr. 1100-01.)

Another of the victim's adult sons, Robin Sutphen, who lived in Florida during the relevant period (Trial Tr. 1118-19), testified that, up to December 2002, he "talked to [his] mom by phone . . . [e]very other day, every third day" (Trial Tr. 1123).

-46-

At that time, "she wasn't depressed. She wasn't sick." (Trial Tr. 1124.) Beginning on or about January 8, 2003, Robin Sutphen "tried to call [the victim] a couple of times [and] didn't really get an answer, it just kept going through to voice mail." (Trial Tr. 1126.) Despite leaving numerous messages, Robin Sutphen did not receive a return call, which concerned him because it was "[j]ust not like [his] mom not to call her son back." (Id.)

Robin Sutphen kept calling and, after approximately a week, Petitioner "finally picked up the phone . . . [and said] that [he and the victim] had been sick, they hadn't been able to get out of bed." (Trial Tr. 1127.)[30] Robin Sutphen did not get to speak to the victim on that occasion and therefore "continued to call [but] continued to not hear back from [her]." (Trial Tr. 1128.) "There were a couple of times when . . . [Petitioner answered and said] she's depressed now, she's in the shower, you know, anything that would inhibit her from coming to the phone." (Id.) "[G]oing two weeks without hearing [his] mom's voice [wa]s not acceptable [to Robin Sutphen]." (Trial Tr. 1129.) As a result, on January 21, 2003, he left a voice-mail message on Petitioner's and the victim's telephone, stating "'If I don't hear from my mother, if I don't hear her voice on my phone, if I don't receive some sort of contact

---

[30] On January 13, 2003, during the period when, according to his above-quoted report to Robin Sutphen, Petitioner suffered from an illness so severe that he could not get out of bed, he enjoyed an evening out at the James Joyce Irish Pub, during which "he struck up a conversation with [a woman], which continued . . . for at least three or four hours . . . ." (Trial Tr. 1589.) During that discussion, Petitioner "indicated that his wife had died. . . . [The woman] asked what she died of and he said cancer." (Trial Tr. 1590.) When the woman departed the pub, Petitioner "gave [her] his email address and he asked [her] to contact him at that address." (Trial Tr. 1590.)

from her, I will be up there, and you don't want to open the door to see me there.'" (Trial Tr. 1129-30.)

That same day (January 21, 2003), at about 6:40 p.m., Hennessey called the victim's home and Petitioner answered, this time reporting that the victim "had gone to symphony practice at that point and that he was concerned about her." (Trial Tr. 1079-81.) He elaborated that the victim had "'been depressed, she won't return calls.'" (Trial Tr. 1084.)[31] Hennessey "said that [she] would come by the next night after work. . . . And [Petitioner] said not to. And [Hennessey] asked why, and [Petitioner] said [the victim] wouldn't want to see anybody, that [Hennessey] should call first before [she] came, and that he would ask [the victim] and then he would tell [Hennessey] whether [the victim] would come out for a walk with [Hennessey] or not. Which was upsetting to [Hennessey] because [she] was in the habit of just swinging by [and] knocking on the door . . . ." (Trial Tr. 1084-85.)

That night, Hennessey "needed to be somewhere at seven, and when [she] pulled out of the parking lot [of her townhouse] it was 6:55 and [Petitioner's wife's] car was still in the driveway, in the parking space [of her townhouse]. . . . [T]hat caught [Hennessey's] attention . . . because [she] had just gotten off the phone with [Petitioner] and he had told [Hennessey] [his wife] was at symphony practice." (Trial Tr. 1081.) When Hennessey returned home two-and-a-half to three hours later, Petitioner's wife's car

_____

[31] Hennessey had never known the victim to exhibit any signs of depression and described her as "a very resilient woman." (Trial Tr. 1085.)

-48-

was gone.  (Trial Tr. 1082.)  Hennessey then "was determined to see [Petitioner's wife] because [Hennessey] was pretty concerned about her.   So [Hennessey] kept going out looking for [Petitioner's wife's] car, and [Hennessey] did that up until about 12:30 at night, and didn't see [Petitioner's wife's] car."  (Id.)

"[I]n the early morning hours of January 22nd of 2003 . . . [, a Durham police officer] received a radio call from 911 . . . [and] [r]esponded to [Petitioner's home] and met with [him] . . . [because he had] report[ed] that his wife was missing." (Trial Tr. 938.)  Petitioner "informed [the officer] that she was a cellist with the Durham Symphony, and that she had rehearsal practice that evening down at the Durham Arts Center . . . ."  (Trial Tr. 939.) According to Petitioner, "she [wa]s normally home about eleven. When she hadn't got home by three, it caused concern."  (Id.) Petitioner described "the vehicle she was driving [and the officer] broadcast it over the police radio . . . ."  (Trial Tr. 941.) Other officers "went around the Durham Arts Center . . . [and] [r]ight across the street the vehicle was located in the parking deck."  (Id.)  Petitioner then told another officer "that he and his wife had been sick for two weeks prior . . . and had not been out of the house much." (Trial Tr. 968-69.)  "[H]e continued on to tell [that officer] that [the victim] had been depressed about being out of work . . . ."  (Trial Tr. 969.)  Petitioner "stated that they had not argued lately" (Trial Tr. 973), but then made an unsolicited comment "that he just want[ed] to know his wife [wa]s okay, even if she doesn't want to see him" (Trial Tr. 974).

Also on January 22, 2003, "at 5:00 in the morning . . . [Petitioner] called and woke [Robin Sutphen] up and let [him] know that [his mother] had never returned home the night before, and that the cops had just found her car." (Trial Tr. 1130.) Later that day, "[Petitioner] came over to [Hennessey's] house . . . ." (Trial Tr. 1082-83.) He "asked [her], didn't [she] know, and [she] . . . said, 'Know what?' He said, '[My wife] is missing.' And [Hennessey] asked him what he meant by that. He said [his wife] didn't return from symphony practice that night . . . ." (Trial Tr. 1084.) Petitioner also spoke to Johnston on January 22, 2003, reporting in a telephone conversation "that his friend Janine had not shown up to symphony rehearsal and was missing." (Trial Tr. 1610.) In the days that followed, Johnston continued to talk by telephone with Petitioner and, although they discussed the victim's disappearance, he still did not disclose to Johnston the fact of his marriage to the victim. (Trial Tr. 1611.)[32]

On January 27, 2003, police officers began executing a search warrant at the home shared by Petitioner and the victim. (Trial Tr. 1178.) Officers encountered a "large conglomeration of computer systems . . . that [they] wanted to recover the information on . . ., so [they] contacted [an agent] with the State Bureau of Investigation . . . [and] asked him to respond and help . . . ." (Trial Tr. 1157.) He subsequently came to the scene and

---

[32] Johnston only learned the truth about Petitioner's marriage to the victim upon locating a story on the internet about his arrest. (Trial Tr. 1611.)

directed the seizure process to ensure that proper forensic examination could occur. (Trial Tr. 1233-37.)

On May 27, 2003, two fishermen found something wrapped in a tarp with a chain attached to it floating in Falls Lake (which straddles Durham and Wake Counties). (Trial Tr. 1676-78.) Upon cutting into the tarp with a pocket-knife, they smelled a strong odor, called 911, and took responding law enforcement officers to the site. (Trial Tr. 1677-78.) The officers recovered the tarp (which, in addition to the chain, had duct tape wrapped around it) and discovered therein a sleeping bag containing a woman's body, which they sent to the medical examiner's office. (Trial Tr. 1672-74.) The medical examiner's office identified the body as that of Janine Sutphen from dental records (Trial Tr. 1726) and assessed the cause of death as asphyxiation, i.e., "covering the mouth and nose with the hand and cutting off air supply or cutting off air supply by strangulation" (Trial Tr. 1732). The victim's sons both recognized the tarp and the sleeping bag used to conceal her body as similar to ones she had owned. (Trial Tr. 1101-02, 1134-35.)

The forensic examination of computers seized from the home of Petitioner and the victim revealed a Google search, on October 25, 2002, for "Neck, Snap, Break and Hold." (Trial Tr. 1411-12; see also Trial Tr. 1401-11 (describing process leading to discovery).) That same day, a user of that computer also accessed and book-marked the website "22 Ways to Kill a Man with Your Bare Hands." (Trial Tr. 1407, 1410-12; see also Trial Tr. 1430-31 (describing website's content, including reference to "Choke Hold").)

Similar forensic examination demonstrated that, over several hours on January 8, 2003, a user of a computer seized from the residence of Petitioner and the victim conducted a Google search for "body decomposition" and then accessed various materials, including an article entitled "What Happens After Death," a page labeled "Decomposed Body" on a pathologist's website, a website called "What is Forensic Entomology" and one of its articles about "using bugs to sort of determine when a body ceased functioning," a website discussing the "Tennessee Body Farm" (i.e., a location where scientists "study forensic entomology and body decomposition"), an article entitled "Time Since Death and Decomposition of the Human Body: Variables and Observations. Case and Experimental Field Studies," and "an article about an anthropologist testifying on decomposition in [a] trial." (Trial Tr. 2024-33; see also Trial Tr. 2020-24 (detailing foundation for testimony).) Also that day, the user searched the term "Rigor Mortis" and visited related sites. (Trial Tr. 2026, 2034-36.)

Additional forensic examination of computers seized from the home Petitioner shared with the victim showed a Google search on January 13, 2003, for the term "Falls Lake, NC depth." (Trial Tr. 1347; see also Trial Tr. 1328-31, 1336-47 (providing background information about forensic examination).) Those examination results also documented Google searches on January 18, 2003, for the phrase "Falls Lake, NC, Depth" and "Falls Lake, North Carolina, Depth." (Trial Tr. 1349.) Further, the computer contained evidence a user visited websites identified in those searches,

including at least one with an underwater topographical map of Falls Lake, as well as another with fishing maps and advertising about boat ramps at Falls Lake. (Trial Tr. 1352-54, 1414-27.) None of the seized computers held information reflecting a more generalized interest in fishing or boating. (Trial Tr. 1450.)

The foregoing evidence thus would have allowed the jury to find the following circumstances:

1) shortly after marrying the victim, Petitioner began a romantic relationship with another woman, whom he made plans to marry, but whom he did not tell about his marriage to the victim;

2) within three months of the victim's disappearance, Petitioner researched methods of killing someone by hand, such as by application of a choke hold;

3) no one but Petitioner saw or spoke to the victim after January 8, 2003;

4) on January 8, 2003, Petitioner researched "body decomposition" and "rigor mortis";

5) on January 13 and 18, 2003, Petitioner researched water depths, topography, and maps of Falls Lake, although he lacked any history of interest in fishing or boating;

6) from January 8 to 21, 2003, Petitioner (A) made totally implausible excuses about the victim's unavailability, even to speak with her sons by telephone, and (B) falsely reported that he (like the victim) had been too sick to get out of bed when, in fact, he spent at least one night during that time out at a bar where he told a woman that his wife had died of cancer;

7) on January 21, 2003, Petitioner received an ultimatum from one of the victim's sons to produce proof of her well-being or face an ugly confrontation;

8) on the evening of January 21, 2003, Petitioner falsely reported to a neighbor that the victim had gone to symphony practice, when (A) he had maintained up to that very moment that she suffered from depression so great that she could not get out of bed or take a telephone call from her sons, (B) her vehicle remained parked at home, and (C) Petitioner still insisted that, although the victim had broken free from depression sufficiently to go to symphony practice that night, she would not want to see anyone the next day due to her severe depression;

9) within hours of that false report, the victim's vehicle disappeared from her house and Petitioner reported her missing;

10) when law enforcement officers responded to the missing person report, Petitioner denied any recent conflict with the victim, but then acknowledged she might not want to see him; and

11) the victim died from asphyxiation, with her body dumped into Falls Lake wrapped in a tarp and sleeping bag like she owned.

The foregoing circumstances strongly support the guilty verdict returned by the jury. Moreover, the record confirms that, in his closing argument, the prosecutor emphasized the above-described evidence, not McNeill's testimony (which the prosecutor mentioned but briefly). (See Trial Tr. 2074-97.) Further, Petitioner, in his own closing argument, stated that the computer evidence, not McNeill's testimony, represented "the only evidence

that was brought to court damaging to [Petitioner] . . . ." (Trial Tr. 2072.)  These considerations provide a more than adequate alternative basis to conclude that Petitioner has not carried his burden of establishing the materiality element of his <u>Brady</u> claim.

Pursuant to the foregoing analysis, the Court rejects Petitioner's request for relief on Ground Seven.

## H.  Ground Eight – Ineffective Assistance of Appellate Counsel

Finally, the Petition offers a claim for ineffective assistance of counsel predicated on the fact that "[Petitioner's] appellate attorney . . . argued in [the] brief [before the North Carolina Court of Appeals] that the proper standard of review on the issue of the admissibility of the cadaver dog evidence was de novo . . . [and] also failed to see the significance of . . . the evidence [concerning the cadaver dog searches] witheld [sic] by the State and thus failed to raise th[at] issue on direct appeal." (Docket Entry 1 at 28.)  The performance and prejudice test from <u>Strickland</u> applies to such claims.  <u>Evans v. Thompson</u>, 881 F.2d 117, 124 (4th Cir. 1989).  Further, where Section 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard."  <u>Harrington v. Richter</u>, 562 U.S. 86, ___, 131 S. Ct. 770, 788 (2011).

Section 2254(d) governs the first part of Ground Eight because Petitioner raised the same claim in his MAR (<u>see</u> Docket Entry 12-10 at 12-14) and the MAR court denied relief on the merits (<u>see</u> Docket Entry 12-11 at 1).  Given Petitioner's perfunctory presentation of

his instant ineffective assistance of counsel claim (see Docket Entry 1 at 28; Docket Entry 22 at 27), he clearly has not overcome the deference accorded to the state court adjudication under Section 2254(d), see, e.g., Icenhour v. Medlin, No. CV612-116, 2013 WL 3270421, at *1 (S.D. Ga. June 26, 2013) (unpublished) ("[The petitioner's] conclusory assertions that the state habeas corpus court erred under § 2254 in applying Strickland to the ineffective assistance of appellate counsel claims before it do not warrant federal relief . . . ."), aff'd, 567 F. App'x 733 (11th Cir. 2014); see also Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011) (noting that Section 2254(d) imposes "a difficult to meet and highly deferential standard . . ., which demands that state-court decisions be given the benefit of the doubt . . . [and that a] petitioner carries the burden of proof" (internal citations and quotation marks omitted)). In particular, given the strength of the evidence unrelated to McNeill's testimony (detailed in Subsection IV.G.), Petitioner could not have shown prejudice associated with his lost opportunity for plain error review of his challenge to McNeill's testimony and thus cannot demonstrate that the MAR court acted unreasonably by denying his related ineffective assistance of appellate counsel claim.

The second part of Ground Eight, which contends Petitioner's appellate counsel should have raised on direct appeal the Brady claim now presented in Ground Seven, falls short as a matter of law because (as shown in Subsection IV.G.) the underlying Brady claim lacks merit. Accordingly, although Petitioner failed to exhaust

that particular ineffective assistance of counsel claim by presenting it in his MAR (see Docket Entry 12-10 at 12-14), the Court will deny said claim (along with the first part of Ground Eight) on the merits, as permitted by 28 U.S.C. § 2254(b)(2).

## V. CONCLUSION

Petitioner's habeas claims do not provide a basis for relief.

**IT IS THEREFORE ORDERED** that Petitioner's Motion for Amendment to Petition and Substitution of Parties (Docket Entry 37) is **GRANTED** and that Cynthia O. Thornton is substituted as Respondent.

**IT IS FURTHER ORDERED** that Respondent's Motion for Summary Judgment (Docket Entry 11) is **GRANTED,** that the Petition (Docket Entry 1) is **DENIED,** and that Judgment shall be entered dismissing this action without issuance of a certificate of appealability.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 21, 2014